WARREN BROS. CO. v. PACE et al.

(District Court, N. D. Ohio, E. D.   June 26, 1916.)

No. 319.

PATENTS ☞328—VALIDITY AND INFRINGEMENT—PAVING MATERIAL.
   The Warren patent, No. 727,505, for a street pavement consisting of broken stone of different sizes down to an impalpable powder in generally specified proportions, in connection with a bitumen binder, claims 5, 6, and 11, construed, and *held* valid, but not infringed by defendants, whose composition is not within the proportions specified in the claims.

In Equity.   Suit by the Warren Bros. Company against W. S. Pace and T. S. Pace, individually and as partners doing business as Pace Bros.   On final hearing.   Decree for defendants.

Westenhaver, Boyd & Brooks, of Cleveland, Ohio, and James M. Head, of Boston, Mass., for plaintiff.

Charles K. Offield, of Chicago, Ill., and Guthery & Guthery, of Cleveland, Ohio, for defendant.

CLARKE, District Judge.   This suit is brought by Warren Bros. Company, a corporation, against the defendants, individually and as partners, to enjoin the carrying out of a contract entered into by the defendants with the commissioners of Cuyahoga county, Ohio, for the construction of a highway of materials such that the plaintiff claims it would infringe the fifth, sixth, and eleventh claims of United States letters patent No. 727,505 owned by the plaintiff.

A considerable part of the roadway had been completed when the case was tried, and the claim of the defendants is that the composition required by the terms of the contract to be used was departed from with the consent of the inspecting and of the county engineers for the reason that the quantities of materials specified were such that they would not absorb the required amount of bituminous matter without making the surface of the road too soft for the use to be made of it.   For this reason all parties concerned confined the testimony to the pavement as actually laid, with the assumption that the remainder of it would be of the same character.

In Warren Bros. Co. v. City of Owosso, 166 Fed. 309, 92 C. C. A. 227, the Circuit Court of Appeals for this (the Sixth) Circuit, decided that the patent in suit is valid, and that claims No. 5, No. 6, and No. 11 were in that case infringed, but what mixture of materials was contemplated or used does not appear from the report.

In Warren Bros. Co. v. City of New York, 187 Fed. 831, 109 C. C. A. 591, the Circuit Court of Appeals of the Second Circuit, following the decision in the Owosso Case held the patent to be valid, and the specifications appearing in the report are held to infringe claims No. 5, No. 6, and No. 11.

A due subordination of authority requires this court to accept as controlling the decision in the Owosso Case, but except for this ob-

ligation, upon the record before me, I should have great difficulty in sustaining this patent. This disposition to question the validity of the conclusion of the Court of Appeals springs chiefly from the impression made upon the mind of this court by the affidavit of Logan Waller Page, which by reference in the affidavit of the defendants' expert, Samuel N. Pond, becomes a part of the record in this case. The testimony of this witness was not in the Owosso Case, but in part at least it appears to have been before the courts of the Second circuit in the New York case.

Page, when he made the affidavit referred to, was director of the office of public roads of the United States Department of Agriculture; he is obviously a man of high scientific attainments, and had served by appointment of the President of the United States at least twice as the representative of the United States at International Road Congresses, one held in Paris and one in Brussels. He states that he had frequently refused to testify in patent cases, and that he had consented to do so only in cases which, though not in form, were in fact against the cities of Chicago and Indianapolis and of New York, and he says that he made exceptions to his practice in these cases because he thought it was his duty to be of service to the public. This witness gives a condensed statement of the industry of road making with stone, and refers to publications in 1893 and 1895, which seemingly disclose clearly enough what Warren describes in the specification of the patent in suit as his discovery, viz. that the best provision for eliminating voids and for establishing stability in paving materials is to be found not, as was supposed before his discovery, in the use of sand or of fine gravel, but in the use of mineral components of relatively large size. He points out very pertinently that the permissible percentages of mineral aggregate stated in the patent in the suit are such as to render the so-called invention extremely vague and uncertain, and he illustrates this statement by showing that if the minimum of the intermediate sizes in the Warren preferred mixture, ranging from one-fourth inch to impalpable powder, is taken, it will be impossible to obtain a 100 per cent. mixture by employing the maximum amounts of the other two ingredients, e. g., 3 per cent. of impalpable material, plus 10 per cent. of material between impalpable powder and one-fourth inch in size, plus 80 per cent. of material larger than one-fourth inch in size, equals 93 per cent. He gives the results of four combinations of stone and impalpable powder, all seemingly within the scope of Warren's preferred mixture, yet in each of these the percentage of voids is above that of claim No. 11, and in three of the cases is very materially above it. From publications long prior to the application for the Warren patent he shows that the statement is seemingly without foundation; that except by his method it is impossible to reduce the void space in an aggregate of rock below 21 per cent. Further to this experienced and obviously candid road builder, the use which Warren makes of the expression, "inherent stability" is, as it seems to this court to be, extremely vague, and he declares that the proportions and gradations of material described cannot be produced except by a most careful separation by measures and screens for different sizes of stone, by selecting the prescribed proportion of

such sizes and by then mixing them in the manner suggested by the patent.

The record in the Owosso Case, though not in evidence, has been inspected by this court, and it is significant that this last statement describes the manner in which the witness (in this case Schultce) testified in the Owosso Case, the plaintiff prepared and mixed its materials in order to obtain the patented combination.

It may be noted in passing that no evidence was introduced in the trial of this case which tends directly to modify the views thus expressed by Mr. Page, and that two cases commenced by the plaintiff, in which his testimony was used, were dismissed after a motion for preliminary injunction was denied.

These observations will suggest why, although this court feels it its duty to follow the Owosso decision, it also regards itself as constrained to put a somewhat strict interpretation upon the claims of this patent, in determining the question whether or not it has been infringed by the defendants, which is the only question which the decision of the Circuit Court of Appeals leaves open for our determination.

The patentee of the patent in suit declares that his invention consists in the discovery that the best composition of the street pavement mixture, to which his patent relates, is one "as free from voids as possible and also stable and nonliable to displacement," and this is obtained, he says, by using larger sizes, grains or pieces of stone— "say up to those which will pass through a 2-inch ring," and by employing with these larger grains, proper quantities of the smaller sizes down to impalpable powder. This general description of his invention is followed by a statement of the "proper quantities" of the indicated ingredients which he has found from experience give the best results, which is "1 per cent. to 3 per cent. of impalpable powder, from 10 per cent. to 30 per cent. of material between impalpable powder and one-fourth inch in size and from 50 per cent. to 80 per cent. larger than one-fourth inch in size."

It cannot escape notice that that part of the specification thus condensed is so indefinite that, as Mr. Page points out, if the minimum amount of the material between impalpable powder and one-fourth inch in size be taken, and the maxima of the two other ingredients be taken, the result is a total of but 93 per cent.; and also that if the maxima of the first and second, the two finer ingredients be taken— 3 per cent. of the first and 30 per cent. of the second—it results that there must be taken 67 per cent. of the coarsest, larger than one-fourth inch in size.

Further reading of the specification finds the patentee declaring that:

"Because of the inherent stability obtained by me by the careful selection and proportioning of several grades of mineral ingredients I am enabled to use an asphalt or bituminous uniting medium of a softer nature and at a lower temperature than could otherwise be used. This is because in my case, the wear and strain fall upon the mineral ingredients and not upon the binder, which latter may be as soft as desirable."

This is important in arriving at just what the patentee claimed his discovery to be, and it obviously suggests that the mixture which he had in mind should be one including stones larger, perhaps much larger

than 1 inch in size. It is notable in this connection that in the first four claims of the patent one element of the mixture claimed to be a discovery consists in material, 50 per cent. to 80 per cent. of the whole, composed of mineral ingredients lying between one-fourth inch and 3 inches in diameter.

The first four claims of the patent give, though somewhat indefinitely, the percentages of the various elements of the mixture proposed, but claims No. 5 and No. 6 are much more general in terms, and are really so indefinite that if they are read unmodified by the specification and earlier claims, they would grant a monoply to the patentee for almost every conceivable mixture of broken stone, provided only that it possessed the quality which the patentee describes as "inherent stability." It would seem clear enough that this is an interpretation of the claims which the Court of Appeals cannot have had in mind as a result of its decision, and it makes it of first importance that we should obtain, if possible, a clear definition of the expression "inherent stability," as it is used once in the specification and in 7 of the 13 claims, including the fifth and sixth claims.

Schultee, one of the expert witnesses for the plaintiff, testifies that with the exclusion of bitumen "inherent stability is the stability of the aggregate per se." The plaintiff's witness, Howard, defines "inherent stability" as meaning "that mineral aggregate mutually supports itself; the larger voids of the larger stones being filled by the next smaller and on down, so that you have a compact piece of mineral aggregate of very unusual inherent stability." And again this witness was asked whether or not "Warren proposes to obtain inherent stability by the use of these stones of such size and in such way, nested and associated together so as, without any bitumen at all, they will mutually support each other," and he answered, "That is really what is new and novel in the patent."

This discussion of the patent and of the evidence introduced on this trial brings us to the crucial question for decision, viz., Does the paving which the defendants are proved to be laying infringe claims No. 5, No. 6, and No. 11 of the patent in suit?

As we have said, a considerable part of the pavement has been finished, and the case was tried upon the theory that the remainder of the work would be done in the same manner as that already completed. For the plaintiff two witnesses, Schultee and Howard, testify on this subject.

Schultee testifies that the sample of the pavement laid by the defendant which he analyzed, exclusive of bitumen, contained 48.8 per cent. of material coarser than one-fourth inch; 3.4 per cent. of impalpable powder, and the rest of it, 47.8 per cent., was graded between the two, and is defined as "sand" by Howard. It contained, Schultee says, 14.2 per cent. of voids. He adds:

"The whole structure was so proportioned as to cause the stones to interlock with each other and produce the inherent stability that is claimed by the patentee"

—and that the stone used was a limestone, the run of the crusher, between 1¼ inch and one-fourth inch.

Howard testifies that he analyzed a part of the sample sent him by Schultee, and that, excluding bitumen, the amount of the aggregate which passed a 200th-inch mesh was 5.5 per cent. the amount which passed a one-fourth inch sieve was 46.8 per cent., and that the amount which was coarser than one-fourth inch was 47.7 per cent. He made the voids 13.6 per cent. He says that in the sample he used there were one or two pieces "just one or two possibly" which on shaking would not have gone through a 1-inch sieve; "you might say, if you took an enormous pile, it would have a few particles larger than 1 inch in size." Though skillfully led, this witness would not go the length of saying that this mixture falls within the preferred proportion of the patent. Obviously it does not, for it contains 46.8 per cent. between impalpable powder and one-fourth inch stone, while the preferred maximum of this size is 30 per cent. This witness says that he would classify that portion of the material as sand which ran from one-fourth inch down to 200th inch; coarser than this he would classify as crushed stone or gravel. The 200th-inch material he classifies as dust. He also divides sand somewhat indefinitely into coarse and fine sand. In this classification of the witness, the sample which he used yielded 5.5 per cent. impalpable powder, 46.8 per cent. of sand, and 47.7 per cent. of stone.

For the defendants Arthur Lee, W. S. Pace, C. E. Betts, and W. E. Heineke testify upon this subject.

Lee is the foreman in charge of the work, and he gives the weight of one batch of material which he says was typical as stone and sand without limestone dust, 859 pounds, limestone dust, 65 pounds. He says that as nearly as he could estimate it, 2,300 pounds of stone were used to each 3,000 pounds of sand, and this is the only division he gives of the amount of sand and stone used. Working out the percentages by familiar methods, this testimony of Lee results in the conclusion that the mixture used by the defendants contains (omitting fractions) 53 per cent. sand, 40 per cent. stone and 7 per cent. dust. The specification in the contract called for three parts stone and two parts sand, and this witness says that it was necessary to depart from these proportions because there was not sand enough in that mixture to carry the bitumen without leaving the pavement too soft, and that the mixture he gave was adopted with the consent of the inspecting chemists and of the county engineers.

W. S. Pace, one of the defendants, testifies much more generally than does Lee, and does not speak of percentages except where he includes bitumen as a part of the total. He says (and Lee and he agree on this) that the material used consists of limestone in size varying from 1¼ inch to one-fourth inch and two kinds of sand, one coarse and one finer. He says that the stone is kept in one pile and two kinds of sand in separate piles; that the two kinds of sand are mixed as nearly as he can judge in about equal weights, and are used with the stone in the proportion of about 2,500 pounds of stone (Lee makes it 2,300) to 3,000 pounds of sand. His description of the quantity of pulverized stone or powder is the same as Lee's. It results that while Pace is not as definite as Lee, their testimony is in substantial agreement.

C. E. Betts is a chemist who analyzed a sample of defendant's pavement as laid, and obtained the result following: Six per cent. of im-

palpable powder; 52.1 per cent. passing a one-fourth inch mesh and retained on the 200th-inch mesh, which would be sand; 41.9 per cent. retained on one-fourth inch mesh, which under the definitions used in this testimony would be stone. Betts used a sample which had a surfacing of bitumen and gravel, so that his results would not be as strictly accurate as those of Schultee and Howard, but the sample produced in court would indicate that the analysis on this account would be more favorable to the plaintiff than the defendant. The approximation of this result to the statement of the composition of the paving made by Lee is impressive.

W. E. Heineke is a representative of the Pittsburg Testing Laboratory, having charge of the inspection of the work done by the defendants in the interest of the county, and for two weeks before the trial he had been making hourly examinations of the mineral aggregate used. He says that the endeavor was to get about a wheelbarrow full of stone to a wheelbarrow full of sand (half coarse and half fine sand) which were alternately fed into the mixing machine. He says that in the same volume the sand would be heavier than the stone, and that they aim to keep the volume approximately the same, but he does not undertake to say how much heavier the sand would be than the stone. He confirmed the testimony of Lee to the extent of saying that about 65 pounds of the pulverized stone is used in a batch of 1,000 pounds of the mixture, and he approves as typical the two samples of sand which are introduced in evidence, one fine and the other coarse.

Assuming now that Lee and Pace and Betts have given the composition of the mixture used by the defendants with approximate accuracy as stone dust 7 per cent., stone one-fourth inch to 1¼ inch in size, 40 per cent., and sand 53 per cent., it cannot reasonably be said to infringe the preferred mixture of the patent, which requires at most 3 per cent. of impalpable powder and 30 per cent. of sand with not less than 67 per cent. of stone larger than one-fourth inch in size; neither does it infringe either the first or second claim of the patent because it contains only 40 per cent. of ingredients between one-fourth inch and 3 inches in diameter, while each of these claims requires a minimum of 50 per cent. of such stone, which with the variations from the other materials used is too great a departure from the formula of these two claims to permit of its being considered an infringement of them. Neither does it infringe the fourth claim because it contains but 40 per cent. of material between one-fourth inch and 3 inches in diameter (none of it larger than 1 inch in diameter) instead of the minimum of 50 per cent. as specified in the claim, and also because of the excess of sand and of impalpable powder which it contains over the quantities specified in this fourth claim.

However claims No. 5 and No. 6, which have been held valid by the Circuit Court of Appeals, do not specify any definite amounts of the various grades of materials to be used. But in these the invention is claimed to reside in so grading the materials "as to give the structure an inherent stability," using the expression as it is defined for us by Schultee and Howard in the terms already quoted in this opinion. Samples of the two kinds of sand and of the stone used by the defendants are before this court, as are also samples of the pave-

ment as completed structure. Schultec and Howard say that in their opinion the compound of materials used by the defendants as shown by their analyses possesses the required inherent stability, but the composition which their analyses of small samples show is so greatly different in proportions of sand and of stone and of powder used from that testified to by the witnesses for the defendant that their conclusion might be applied to the samples used and yet not be true as to the actual roadway constructed. With the evidence thus far from satisfying on this important question, it is quite impossible for this court to believe that such small pieces of stone as the exhibits show are used by the defendants can be mixed with such sand as is shown to be used in the proportions of approximately 40 per cent. of the former to 53 per cent. of the latter, and that by simply mixing, without bitumen, they can be so nested and associated together as to create a stable mass, meaning thereby a mass with a stability sufficient to permit its supporting such vehicles and animals as are used upon public highways. It would seem that the utmost that can be said for the testimony introduced by the plaintiff on this point is that it leaves the court in very great doubt as to whether the mixture used by the defendants possesses "inherent stability" as defined by its witnesses, and such a doubt is of course fatal to the plaintiff's claim, which must be specifically proved (Imhaeuser v. Buerk, 101 U. S. 647, 25 L. Ed. 945) by a preponderance of the evidence (Bene v. Jeantet, 129 U. S. 683, 9 Sup. Ct. 428, 32 L. Ed. 803).

The eleventh claim of the patent is, if possible, more general in terms than the fifth and sixth claims, and makes the distinguishing quality of the mixture consist in the "spaces between the mineral ingredients being less than 21 per cent. of the whole, and the plastic binder occupying such space." Judge Lurton in the Owosso Case declares that:

"The fundamental idea of Warren is not that the 'density' of his composition gives the stability which he claims, but that the mineral aggregate should of itself resist displacement by traffic."

The effect of this declaration makes claim No. 11 practically identical with claims No. 5 and No. 6, and requires that before any material used can infringe this claim No. 11 it must have the "inherent stability" of the fifth and sixth claims, regardless of the less than 20 per cent. of voids, and therefore if our conclusion that the mixture used by the defendants does not infringe the fifth and sixth claims is correct, we must also conclude that it does not infringe the eleventh claim.

It results that a decree will be entered sustaining as valid claims No. 5, No. 6, and No. 11 of the patent in suit, but finding that the construction of the defendants does not infringe them, and that therefore the bill must be dismissed and the defendants recover their costs.