EVANS v. WARREN BROS. CO.

(Circuit Court of Appeals, Third Circuit. March 9, 1917.)

No. 2173.

PATENTS ☞328—INFRINGEMENT—PAVEMENT.

The Warren patent, No. 727,505, for a pavement, covers a pavement consisting of broken stone of graded sizes, from two inches in diameter down to dust, combined with a comparatively soft binder, as asphalt, and is not infringed by a pavement in which a single grade of large pieces of stone, of comparatively uniform size, is used, and the spaces filled in with sand.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Suit in equity by the Warren Bros. Company against W. C. Evans. Decree for complainant, and defendant appeals. Reversed.

For opinion below, see 234 Fed. 657.

Walter B. Saul, of Philadelphia, Pa. (Cornelius D. Ehret, of Philadelphia, Pa., of counsel), for appellant.

Edward G. McCollin, of Philadelphia, Pa., and Head, Drinkwater & Crafts, of Boston, Mass. (W. K. Richardson and James M. Head, both of Boston, Mass., of counsel), for appellee.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

BUFFINGTON, Circuit Judge. In the court below, Warren Bros. Company, the owner of patent No. 727,505, granted May 5, 1903, to Frederick J. Warren, for a new and useful improvement in pavements, brought suit against W. C. Evans, charging infringement of claims 5, 6, 9, and 11 thereof. On final hearing that court, in an opinion reported at 234 Fed. 657, held said claims valid and infringed. From a decree so adjudging the defendant took this appeal.

This patent has been considered by various federal courts, and its validity established. An attack on its validity is made in this case, and certain evidence not produced in these prior cases is here involved. As the present case turns on the question of infringement, we will for present purposes assume, without discussing or adjudging, the validity of the claims here involved.

The specification of Warren's patent shows that the object of his alleged invention was to make a road "as dense, as free from voids as possible." His alleged discovery in making was that he had found:

"That what has ordinarily been supposed to be the best provision for eliminating voids and establishing stability has, as a matter of fact, been almost the poorest provision for accomplishing these purposes."

He then states that:

"The provision usually accepted as the best is that in which the mineral matter used as a basis of the pavement and united by the plastic asphalt vehicle shall be in the shape of a sand or fine gravel."

He then states that this has been an error, and that he had discovered:

"That there is a smaller percentage of voids in a pavement which contains mineral components which are of relatively large size."

He further states that:

The former method has been "to exclude from its composition all pieces of stone or sand larger than one-tenth of an inch in diameter," and that, following this method, the smallest percentage of voids that it "has been possible to produce has been 21 per cent. of the aggregate, while by the use of the larger sizes, grains, or pieces—say up to those which will pass through a two-inch ring—and employing with these larger grains proper quantities of the smaller sizes down to an impalpable powder, it is possible to reduce the voids of the mineral base below 10 per cent. of its bulk, and such a mixture, when assembled and compacted together, will form a dense, solid, homogeneous, compact body, with the smallest percentage of voids and possessing the highest degree of stability, * * * because of the sizes of the pieces and their arrangement with respect to each other, offers the smallest areas of surfaces for the attachment of the plastic composition to them, so that not only is a superior binding effect or union obtained by the plaster composition, but a smaller quantity of it is necessary for the purpose of obtaining the superior result or product."

From this description it will be seen that the gist of his invention consisted, first, of the use of stone larger than one-tenth of an inch in diameter; second, the employment with these larger sizes of proper quantities of smaller sizes down to an impalpable powder; and, third, the discovery that by the use of these graded sizes it was possible to reduce the voids between the mineral base elements below 10 per cent. of its bulk.

The suggested use by him of these variant ingredients he gives as follows: Impalpable powder, 1 to 3 per cent.; material between impalpable powder and one-fourth of an inch, 10 to 30 per cent.; material larger than one-fourth of an inch, 50 to 80 per cent. Using these proportions, he states:

"I have found that these ingredients, when associated together, produce a mass or body having less than 20 per cent. of voids."

He further states the benefits arising from the use of these several grades of mineral ingredients as follows:

"Because of the inherent stability obtained by me by the careful selection and proportioning of *several* grades of mineral ingredients, I am enabled to use an asphalt or bituminous uniting medium of a softer nature and at a lower temperature than could otherwise be used."

Such was the disclosure, and in substance the whole disclosure, made by Warren. He made clear what he regarded as his invention, and he pointed out a way which he calls the preferable way, but which is, in fact, the only way he had found, of making use of his invention, and that way consisted in substance of the use of different grades of stone and in the suggested proportions of the different materials which went to make up his road. Assuming that the disclosure thus made constituted invention, he was allowed a number of claims which specifically covered the mixture which he had suggested. It is quite apparent that, measuring Warren's patent by its disclosure and limiting its claims to the specific proportions indicated by him, or substantially equivalents thereof, the defendant in this case, who has not been sued for infringement of any of such claims, did not in fact infringe them, and the plaintiff was compelled to sue upon claims of a broader character.

The defendant is using a composition in road making called "Filbertine," which has been in use in Pennsylvania for many years, and which it described in the specifications of its state highway department, and we assume the defendant is making a pavement which conforms to such specifications. In that regard, the state specification requires:

"The mineral aggregate in the Filbertine mixture shall be composed of sound, hard, crushed trap rock, with a coefficient of wear of not less than 15, or limestone with a coefficient of wear of not less than 10; hard grained sand, such as required for asphalt wearing surface mixture; and limestone dust or Portland cement, which shall be combined with the asphaltic cement within the following proportions best suited for making a dense mixture:

Bitumen ...........................................6.0 to 8.0 per cent.
Limestone dust, or Portland cement...............4.0 to 6.0 "     "
Stone, ¾-inch hard crushed......................55 to 60 "     "
Sand, coarse to fine.............................30 to 35 "     "
Other ingredients ...............................Not over 1 per cent."

From this specification it will be seen that the defendants are using sand, which, of course, they were permitted to do without objection, which sand was 30 to 35 per cent. of the mixture. When it came to stone, however, by this specification, instead of using stone of different and varying grades, the contractor was called upon to use stone of one grade only, viz., ¾-inch, 55 to 60 per cent., which was not the run of the crusher. It will thus be seen that the Filbertine specified was not the composition, so far as varieties of stone were concerned, of the Warren specification. Indeed, the Warrenite, which is made under this patent, was recognized by the state under a different head and requirement, in the same specification, and as embodying graded stone and a freedom from voids. Thus, in its specifications for Warrenite, the state says:

"*Mineral Aggregate.*—The several grades or sizes of stone, sand, and filler composing the mineral aggregate shall be accurately measured and weighed

in such proportions as may be determined by laboratory tests to give the wearing surface a useful degree of density, rigidity, inherent stability, and freedom from voids:

Material passing 1¼-inch screen and retained on No. 2 sieve, 40 to 60 per cent.

Material passing No. 2 sieve and retained on No. 4 sieve, 10 to 20 per cent.

Material passing No. 4 sieve and retained on No. 10 sieve, 10 to 5 per cent.

Material passing No. 10 sieve and retained on No. 30 sieve, 10 to 5 per cent.

Material passing No. 80 sieve, at least 25 per cent. of which will pass a No. 20 sieve, 10 to 5 per cent.

The balance to pass No. 30 sieve and be retained on No. 80 sieve."

It will thus be apparent that from 40 to 60 per cent. of the Warrenite mineral is between the sizes of 1¼-inch and ½-inch; from 10 to 20 per cent. it is ¼ to ½ inch, from which it will be seen that from 50 to 80 per cent. of the mineral material is ¼ of an inch in size, or in excess thereof, while in the Filbertine the only stone ingredient is of ¾-inch size. It is thus very clear that Filbertine is not the Warrenite described in the patent, and that it does not fall within any of the specific claims which have not been sued on.

Does it fall within the more general claims 5, 6, 9 and 11,[1] which have been sued on? In considering them, a vast amount of discussion has been injected into this case as to what is meant by inherent stability, and as though a monopoly could be granted for inherent stability. It is quite evident from the claims that, where the phrase "inherent stability" is used, it means simply the self-contained stability of the composition, its inherent power to make itself stable, and that the use of inherent stability in the several claims is a description of the type of pavement which Warren disclosed and claimed. For instance, on line 55, he says that:

His mixture, "when assembled and compacted together, will form a dense, solid, homogeneous, compact body, with the smallest percentage of voids and possessing the *highest degree of stability*."

On line 73 of page 2 he says:

"Because of the inherent stability obtained by me by the *careful selection* and proportioning of *several* grades of mineral ingredients, I am enabled," etc.

It is quite evident, therefore, that what is described by him as inherent stability is a result derived from the ingredients and proportions which he has disclosed. In the very nature of things, he could not

[1] "5. In a street pavement, a bituminous mineral structure, the mineral ingredients of which are mixed and of several grades, so graded as to give the structure an inherent stability.

"6. A bituminous street pavement structure containing mixed mineral ingredients of such grades as to give the structure an inherent stability."

"9. A street pavement wearing section composed of a mineral structure of inherent stability formed of several grades of material so proportioned as to have a per cent. of voids less than 21 per cent. of the whole, in combination with a comparatively soft bituminous binder filling said voids and rendering the whole permanent in nature and elastic and waterproof in character."

"11. A street paving structure composed of a mixture of mineral or wearing ingredients, and a plastic binder, the space between the mineral ingredients being less than 21 per cent. of the whole, and the plastic binder occupying said space."

have a monopoly of a physical characteristic, such as the quality of inherent stability.

Turning, now, to the claims of a more general nature, which are here sued upon, No. 5 reads as follows:

"In a street pavement, a bituminous mineral structure, the mineral ingredients of which are mixed and of several grades, so graded as to give the structure an inherent stability."

It is quite evident that the stone mineral mixtures in Filbertine are not, in the words of the claim, "so graded as to give the structure an inherent stability," for the simple reason that they are not graded at all, and that the specified stone item in Filbertine, viz. stone, ¾-inch hard crushed, 55 to 60 per cent., is not graded; consequently, there is no infringement of claim 5.

Claim 6 reads as follows:

"A bituminous street pavement structure containing mixed mineral ingredients of such grades as to give the structure an inherent stability."

This is but a modification of claim 5, and is based on a graded mineral composition. The pertinent element is "mineral ingredients of such grades as to give the structure an inherent stability." No grades are used in Filbertine, and consequently, no grades being used, any inherent stability Filbertine has is not due to the use of grades of mineral ingredients.

Claim 9 reads as follows:

"A street pavement wearing section composed of a mineral structure of inherent stability formed of several grades of material so proportioned as to have a per cent. of voids less than 21 per cent. of the whole."

The fact simply is that Filbertine does not have the several grades of material, and consequently no proportioned grades, and while Filbertine as a structure may have a percentage of voids less than the 21 per cent. of the claim, yet that percentage of voids thus claimed is based on a mineral structure of several grades, and consequently, whatever voids Filbertine has is a void that is obtained by a different method than the graded material method of claim 9.

Claim 11 reads as follows:

"A street paving structure composed of a mixture of mineral or wearing ingredients, and a plastic binder, the space between the mineral ingredients being less than 21 per cent. of the whole, and the plastic binder occupying said space."

If this claim is to be construed as a monopoly for any structure that contains less than 21 per cent. of voids, it is not a patentable, allowable claim, for it would be a claim for a mere physical fact. If the claim is to be allowed at all, it should be restricted to the graded mineral composition which the specification discloses, and which, so far as the proportion of voids goes, was the basis of his patent. For example, the specification says:

"I have found that these ingredients, when associated together, produce a mass or body having less than 20 per cent. of voids."

It would seem, therefore, that such graded ingredient was his disclosure, and his only disclosure, and that a structure, even though it

has less than 20 per cent. of voids, but which does not contain "these ingredients," was something that Warren neither discovered nor disclosed.

In view of these considerations, we feel that the claims of Warren should be restricted to the proportions which he disclosed, or their substantial equivalents. Indeed, the general problem of the use of graded stones to reduce voids was a fact already known to road builders. Thus, Codrington in his book, Maintenance of Macadamized Roads, after describing certain experiments which resulted in finding "that by packing irregularly shaped broken stone in a chest the empty space could be reduced to as little as 40 per cent. of the whole," had stated:

"As a general result, the size of the stones was without sensible influence on the proportion of the empty space if the stones were of an even size, but stones of various sizes, mixed together, gave a smaller proportion of void, which diminished as the variety in the size of the stones was greater."

It seems quite clear this teaching that various sizes of stone mixed together gave a smaller proportion of void, and that that void diminished as the variety in the size of the stone was increased, was well known previous to Warren, and that, if his disclosure be held inventive, it must be confined to the particular proportions which he disclosed. And an examination of the decided cases, which are so strongly relied on here to influence our decision, shows they concerned roads where different grades of minerals were used. None of them involved a case, as here, where the mineral was confined to one grade of stone. In the Owosso Case, 166 Fed. 312, 92 C. C. A. 230, Judge Lurton says:

"Warren's invention, shortly stated, consists in the discovery that an aggregate of *large and small pieces of stone, together with a certain proportion of stone dust*, all mixed together and thoroughly permeated with bitumen or asphalt, results, when set, in a compact, stable structure. * * * Under the evidence, the particles are more compact in their relation to each other, and there is a minimum of friction in their interaction. The larger pieces of stone withstand the tendency of the small grains or dust to slip by each other and change the form of the pavement. * * * The fundamental idea of Warren is, not that the *'density'* of his composition gives the stability which he claims, but that the *mineral aggregate* should of itself resist displacement by traffic."

The judge (see 166 Fed. 317, 92 C. C. A. 227) further says:

Warren's "real discovery was that, by the use of a *large proportion* of mineral in pieces *as large* as two inches in diameter, *mingled* with small pieces *graded* down to dust, less bitumen was needed to act as a binder, because the mineral ingredients so graded and mingled furnished stability as well as density, *which relieved the carrying strain upon the bitumen.*"

It will be observed that there is no discussion in the case of the particular form of the infringing road, but we must assume that it was one in which the stones consisted of several graded sizes, because of the emphasis in the opinion of graded stones as an element of the invention. This Owosso Case was simply followed in Warren v. Montgomery (C. C.) 172 Fed. 415.

In Warren v. New York City, 187 Fed. 834, 109 C. C. A. 594, it is quite clear that the stone ingredients were of a graded character. Thus Judge Coxe says:

"In the present instance, however, the particles of stone must pass through a screen 'with a one-inch mesh, and consequently the largest pieces must be less than an inch, and vary *from the maximum down to the smallest pieces.'*"

It will thus appear that the mineral, including, as it did, everything that passed through a one-inch mesh, was the resultant run of the crusher, which would necessarily have smaller grades of stone.

In Warren v. Grand Rapids (D. C.) 216 Fed. 367, the infringing requirements were that:

"The *mineral aggregate* shall consist of broken stone, or broken stone and sand, of a fairly uniform *grading from the largest to the smallest particles,* in such proportions as to give the mixture a maximum degree of density and low percentage of voids."

It will thus be seen that in all these cases there was a series of graded stones. In the present case there is but a single grade of stone, namely, that which passes through a ¾-inch mesh, and that which is caught on a half-inch mesh. All the grades from ½ inch down to sand are excluded, and there is a jump or step, as distinguished from intermediate serial grading, directly down to a fine void-filling mineral material whose coarsest component is sand. It seems to us, therefore, that the object in using different grades of stone was to fill up the interstices or voids between larger pieces of stone by smaller pieces of stone, and that this is a very different structure from one where a single grade of large pieces of stone and of substantially uniform sizes, namely, from ¾ to ½ inch, is filled with particles of sand, for, as stated by Codrington:

"The size of the stone was without sensible influence on the proportion of the empty space, if the stones were of an even size; but stones of various sizes, mixed together, gave a smaller proportion of voids, which diminished as the variety and the size of the stones was greater."

From these views, it seems to us quite clear that Filbertine does not come within the claims of this patent. The decree below must therefore be vacated, and the cause remanded, with instructions to dismiss the bill on the ground of noninfringement.